**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**WILLIAM L.C. WILKINSON,**

                              **Plaintiff,**

        **vs.**                                            **5:12-cv-1725**
                                                            **(MAD)**

**CAROLYN COLVIN, Acting Commissioner of**
**the Social Security Administration,**

                              **Defendant.**
_____

**APPEARANCES:**                        **OF COUNSEL:**

**IACONIS LAW FIRM**                     **CHRISTOPHER D. THORPE, ESQ.**
501 Genesee Street
Chittenango, New York 13037
Attorneys for Plaintiff

**SOCIAL SECURITY ADMINISTRATION**      **KAREN T. CALLAHAN, ESQ.**
Office of Regional General Counsel
Region II
26 Federal Plaza - Room 3904
New York, New York, 10278
Attorneys for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

On December 15, 2009, Plaintiff protectively filed applications for both disability

insurance benefits ("DIB") and an application for supplemental security income ("SSI"), alleging

a period of disability beginning on November 5, 2009. _See_ Administrative Record ("R.") at 157-

167. On March 24, 2010, Plaintiff's applications were initially denied, and upon Plaintiff's

request, a hearing was held on February 23, 2011. _See id._ at 86-93, 33. At the hearing, Plaintiff

orally amended his alleged disability onset, now claiming a period of disability beginning on

October 26, 2009. *See id.* at 33. Thereafter, the ALJ issued an unfavorable decision on June 24, 2011, finding that Plaintiff was not disabled within the meaning of the Social Security Act (the "Act"). *See id.* at 13-30.

On August 8, 2011, Plaintiff timely filed a request for review of the ALJ's unfavorable hearing decision. *See id.* at 10-12. The Appeals Council denied review by letter dated October 1, 2012. *See id.* at 1-6.

On November 21, 2012, Plaintiff filed a summons and complaint in this Court seeking judicial review of the Commissioner's unfavorable decision. *See* Dkt. No. 1. The Commissioner filed an answer to the complaint on March 23, 2013. Currently pending before the Court are the parties' cross-motions for judgment on the pleadings. *See* Dkt. Nos. 17-18.

## II. BACKGROUND

Plaintiff seeks DIB and SSI benefits alleging that he was suffering with a "disability" within the meaning of the Act since October 26, 2009, due to multiple impairments, including "[b]ack problems, left foot problem[s], lupus," "[m]ental health problems," "right knee problem[s]," and "left hand numbness." *See* R. at 182. Plaintiff was employed as a automobile detailer until November 4, 2009 and remained insured for purposes of the Act through December 31, 2013. *See id.* at 16.

Plaintiff was born on September 1, 1970. *See id.* at 84. Plaintiff had a highschool education, and a history of unskilled work, including stocking shelves at several different stores, as a sales associate at a home improvement store, and as a car detailer at a car sales company. *See* R. at 184. Plaintiff has not been employed since November 4, 2009. *See id.*

## A.    Psychological conditions

A "Confidential Medical Report - Psychiatric Disability" was completed on October 22, 2007 by Colleen Miller, LCSW and Steven Adams, Ph.D., Plaintiff's treating therapist and supervising psychologist.  *See* R. at 514-515.  Plaintiff was diagnosed with depressive disorder, intermittent explosive disorder, and personality disorder.  *See id.* at 514.  Plaintiff's affect was constricted, but could be congruent at times.  Plaintiff became agitated when under pressure or when he perceived an injustice towards him.  The report noted became enraged and provoked, when most people would ignore the situation, and became verbally abusive.  *See id.*  Further, the report indicated that stress affected his personal and work relationships and that he did not respond well to pressure in the workplace.  *See id.* at 515.

On May 19, 2008, Plaintiff began treatment with the Madison County Mental Health Department.  *See* R. at 366.  Plaintiff reported to Colleen Miller that he had been terminated from his job because someone had complained about "sexual remarks."  *Id.*  At first he indicated that the person who complained about him was a "narc," but then said that "she was wrong or lied and he had not done or been the one to say sexual things, that it was someone else."  *Id.*  In a progress note dated July 23, 2008, Ms. Miller indicated that, as his therapy progressed, Plaintiff reported increased control over his temper and "a significant reduction in incidents of poor anger management."  *Id.* at 369.  Ms. Miller noted similar progress being made in progress notes from sessions with Plaintiff from August through December of 2008.  *See id.* at 370-77.  On December 1, 2008, although Plaintiff indicated that he needed help with temper control and learning socially acceptable ways to express anger, he refused to attend group anger management sessions because he claimed he was "uncomfortable" in groups.  *See id.* at 376.

Throughout the beginning of 2009, the progress notes indicate that Plaintiff was still dealing with anger management issues, and that he had a tendency to "sound off" when frustrated. *See id.* at 378-89. In an April 10, 2009 treatment plan review, Gregory Owens, a therapist with the Madison County Mental Health Department, noted that Plaintiff had made "modest" progress with some of his treatment goals, but also noted several areas in which Plaintiff needed to make additional progress. *See id.* at 389. On August 4, 2009, Plaintiff reported "decreased problems with anger but ha[d] vague complaints of depression." *Id.* at 385.

On October 26, 2009, Plaintiff refused to complete paperwork prior to his session and was "gruff" with the staff. *See id.* at 385-86. When asked why he was again seeking treatment, Plaintiff told Dr. Kim Guarascio, Ph.D., that he was "depressed," and described his symptoms as a lack of motivation to do the things he enjoys. *See id.* at 386. Further, Plaintiff reported a confrontation with his friends over the weekend, "and had words with one of them while playing dungeons and dragons." *Id.* During a session on November 9, 2009, Plaintiff informed Dr. Guarascio that he still felt depressed and that he still does not feel like engaging in some of the activities that he used to enjoy (*i.e.*, playing Dungeons and Dragons and spending time with friends), but admitted that he still does engage in some of these activities. *See id.* Plaintiff also stated that he is unwilling to take medication and that he is unwilling to attend group anger management session. *See id.* at 387. Although Plaintiff informed Dr. Guarascio that his goal in attending their therapy sessions was to treat his depression, Dr. Guarascio informed him that "his stated symptoms do not meet diagnostic criteria for depression." *Id.*

On January 29, 2010, Plaintiff again saw Dr. Guarascio. *See id.* at 439. Plaintiff again reported that he lacks motivation to do certain things and that he has "some low mood due to his physical problems and stressors." *Id.* Plaintiff informed Dr. Guarascio that he still does not want

to take any medications and that he will not attend group anger management sessions. *See id.* Plaintiff informed Dr. Guarascio that he "wants a therapist 'like Greg or Colleen' to just listen to what he has to say and offer advice." *Id.* When Dr. Guarascio recommended Plaintiff seek treatment with another provider, he refused because he "'didn't want to spend the gas money to drive to Syracuse or Utica.'" *Id.* Dr. Guarascio discussed this issue with Dr. Steven Adams and they decided to inform Plaintiff that "the agency would offer him individual therapy provided that he attend and complete Anger Management Group." *Id.* at 440. Plaintiff responded that he was unwilling to participate in group anger management sessions. *See id.* Thereafter, when Dr. Adams informed him that they believed that Plaintiff would not benefit from individual therapy alone, Plaintiff still declined to pursue the recommended treatment and Plaintiff's case was closed. *See id.* at 440-41.

## B. Physical conditions

On August 12, 2008, Plaintiff was examined by Dr. Joseph Pierz, M.D. *See* R. at 352. Plaintiff complained of "left great toe pain," which he had been experiencing for a few weeks. *See id.* Plaintiff was diagnosed with "left great toe gout" and given a prescription to address his condition. *See id.* at 353-54. Dr. Pierz examined Plaintiff again on August 27, 2008, and Plaintiff was given an injection of Depo-Medrol and Xylocaine. *See id.* at 355. On September 10, 2008, after his condition worsened, Dr. Pierz performed an excision of the mass on his left great toe. *See id.* at 335, 357. In a December 24, 2008 follow-up examination, Dr. Pierz noted that Plaintiff continues to have some pain in the left great toe and stiffness of the joint. *See id.* at 360. Dr. Pierz could not explain why the pain had persisted, but noted that he believed that Plaintiff could go back to work. *See id.* After several additional appointments and treatment for an ingrown

toenail, Plaintiff commenced physical therapy on March 24, 2009. *See id.* at 362-65, 442, 455-65, 529.

On February 25, 2011, Timothy Damron, M.D., indicated that the toe was "next to impossible to move," secondary to pain. *See* R. at 533. X-rays showed "calcification . . . certainly consistent with cartilage calcification, as would be suggestive of synovial chondromatosis type process." *Id.* at 535. After a review of a CT scan, diagnosis was synovial chondromatosis, and surgery was indicated, with an anticipated surgery date of March 30, 2011. *See id.* The surgery was explained as follows: "We do an excision of the soft tissue extensions, as well as an arthrotomy of the joint, debridement of the synovectomy of the joint, and trying to make a volar arthrotomy to get at the deeper soft tissues of the plantar surface. This will be a difficult procedure." *Id.*

Plaintiff also claims to have injured his back in July of 2006, and, since that time, has had intermittent lower back pain. *See* R. at 505. On February 5, 2007, Plaintiff was examined by Thomas Haher, M.D., for lower back pain, with radiation and weakness into both lower extremities, and left upper extremity radiation. *See id.* Plaintiff claimed that the pain was worse with activity, sitting, standing, repetitive motion, bending, lifting, and reaching. *See id.* Dr. Haher found that Plaintiff's range of motion was moderately reduced in all directions. *See id.* Dr. Haher also noted that Plaintiff had been treated by a physical therapist and that the previous treatments had "provided some relief of the pain." *Id.* at 506. Dr. Haher discussed the possibility of surgery with Plaintiff. *See id.* at 507. On March 1, 2007, Plaintiff again saw Dr. Haher since his symptoms had not improved. *See id.* at 509. Despite his pain, Plaintiff declined surgery and opted for chiropractic treatment instead. *See id.* at 511; *see also* Dkt. No. 17 at 12.

On January 28, 2009, Plaintiff was examined by Dr. Daniel Ratnarajah, M.D., for a "work evaluation." *See* R. at 468. Dr. Ratnarajah noted that Plaintiff had "multiple vague complaints, including back pain, wrist pain, and toe pain." *Id.* Given the limited nature of the examination, Dr. Ratnarajah was "unable to evaluate his functional capacity," and, therefore, referred Plaintiff to physical therapy to do a formal functional evaluation. *See id.* On March, 24, 2009, Plaintiff was examined by Dianne Fukes, a physical therapist at the Oneida Healthcare Center. *See id.* at 469-71. Plaintiff complained of, among other things, lower back pain, which was exacerbated by bending forward, lifting and sitting for longer than one (1) hour. *See id.* at 469. Ms. Fukes determined that Plaintiff "demonstrated the ability to lift medium workloads with fair body mechanics. His pain responses to lifting appeared exaggerated. . . . His overall flexibility is reduced in the spine and lower extremities. This client would best function in a workplace that limited lifting and allowed for frequent position changes." *Id.* at 470-71.

In February of 2010, Plaintiff was referred to Dr. Kalyani Ganesh for a physical examination by the Division of Disability Determination. *See* R. at 402-05. Upon completion of the examination, Dr. Ganesh summarized the findings as follows: "No gross limitation sitting, standing, or the use of upper extremities. The claimant was observed interacting with his 4-year-old child with all the bending and walking, and no gross difficulties noted at the time." *Id.* at 405.

On September 2, 2010, Plaintiff again went to the Oneida Healthcare Center for physical therapy, and was seen by physical therapist Al Salati. *See id.* at 472-74. Plaintiff complained of pain that increased with sitting, standing, walking and lifting. *See id.* at 472. Forward flexion and standing extension were moderately limited. *See id.* The physical therapists observed that Plaintiff "does not appear to be in distress" and also that "[h]is gait does not appear antalgic, movement[s] are non-guarded." *Id.* at 473.

On September 22, 2010, Plaintiff was again examined by Dr. Ratnarajah. *See id.* at 451-52. Plaintiff complained of back pain, knee pain, and foot pain. *See id.* at 451. Plaintiff denied "any anxiety/depression or suicidal ideations." *Id.* According to Dr. Ratnarajah, "[o]n examination of the back, he was really tender throughout in deep palpation. Otherwise unremarkable. Straight leg raise while sitting supine was within normal limits, but he was slow in doing so." *Id.* at 452. An MRI taken on September 29, 2010 revealed the following: "Mild degenerative disc disease with loss of disc T2 signal and disc bulge is isolated to L4-5. There is otherwise no disc herniation or significant spinal canal or neural foraminal narrowing to cause neural impingement." *Id.* at 513. Plaintiff continued receiving physical therapy through October 26, 2010, with little improvement noted. *See id.* at 499.

In addition to the above discussed physical injuries, Plaintiff also claims that he has asthma and a left wrist injury. On April 25, 2008, Plaintiff sought emergency room attention for difficulty breathing. *See* R. at 321-23. He was treated and released. *See id.* A pulmonary function test on January 28, 2009, revealed some restrictive lung patterns. *See id.* at 468. Plaintiff claims that he injured his left wrist in April of 2008 and was treated at the Oneida Healthcare Center from April 23, 2008 through July 24, 2008. *See id.* at 294-317. "Upon discharge, range of motion was restricted but functional. He has complained of occasional pain, stiffness and limitations of motion thereafter." *See* Dkt. No. 17 at 13.

## C.     The ALJ's decision

On June 24, 2011, the ALJ found that Plaintiff was not disabled within the meaning of the Act. *See* R. at 13-30. At step one of the sequential evaluation, the ALJ found that Plaintiff had not engaged in substantial gainful activity since November 5, 2009. *See id.* at 18. At step two,

the ALJ found that Plaintiff had several severe impairments: arthritis, a tumor on his left great toe, and a bulging disc at L4-L5. *See id.* In so finding, the ALJ considered Plaintiff's alleged depression, but found that it did not rise to the level of a severe impairment. *See id.* at 18-20. At step three, the ALJ found that none of Plaintiff's severe impairments met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See id.* at 20. Next, the ALJ found that, throughout the relevant period, Plaintiff had the residual functional capacity to perform sedentary work. *See id.* at 20-23. At step four, the ALJ found that Plaintiff was not capable of performing his past relevant work as a general laborer. *See id.* at 23. Finally, at step five, the ALJ found that there was other work in the national economy which Plaintiff could perform. *See id.* at 23-25.

### D.     Plaintiff's motion for judgment on the pleadings

In his motion for judgment on the pleadings, Plaintiff first argues that the ALJ failed to properly utilize the factors set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c) in assessing the weight to be given to the opinions of the State Agency's examining psychologist. *See* Dkt. No. 17 at 15-17. Second, Plaintiff contends that the ALJ's conclusion that Plaintiff has no more than a "mild" limitation with regard to social functioning, concentration, persistence, or pace, is not based upon substantial evidence. *See id.* at 17-18. Third, Plaintiff argues that the ALJ committed reversible error in failing to properly utilize the factors of SSR 96-7p and 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) in evaluating Plaintiff's credibility and the subjective symptoms that Plaintiff contended were disabling. *See id.* at 18-27. Finally, Plaintiff asserts that the ALJ's residual functional capacity ("RFC") determination was not supported by substantial evidence. *See id.* at 27-28.

# III. DISCUSSION

## A.    Standard of Review

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether a plaintiff is disabled.  *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the Court must examine the Administrative Transcript to ascertain whether the correct legal standards were applied, and whether the decision is supported by substantial evidence.  *See Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000); *Schaal v. Apfel*, 134 F.3d 496, 500-01 (2d Cir. 1998).  "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citations and quotations omitted).

If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992).  In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Valente v. Sec'y of Health and Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984).

For purposes of SSI, a person is disabled when he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

In reviewing the denial of a claim, the Court will typically employ the traditional five-step analysis set forth in *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982), and other cases. The five-step analysis is detailed as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Id.*

In this analysis, the claimant has the burden of proof as to the first four steps, while the Commissioner has the burden of proof on the fifth step. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Ferraris v. Heckler*, 728 F.2d 582 (2d Cir. 1984).

**B.      Application**

***1. The ALJ properly considered Plaintiff's depression***

Plaintiff claims that the ALJ committed reversible error by failing to properly utilize the factors set forth in 20 C.F.R. §§ 1527(c) and 416.927(c) in assessing the weight to be given to the opinions of the state agency's examining psychologist. *See* Dkt. No. 17 at 15-17. Specifically, Plaintiff contends that Dr. Noia did not have an ongoing treatment relationship with Plaintiff and

saw him on only one single occasion. *See id.* at 16. Plaintiff argues that Dr. Noia presented "very little 'relevant evidence' to support his opinion," yet "the ALJ states that such examination was sufficient, when coupled with 'the claimant's subjective statements, which are consistent with the record as a whole[.]'" *Id.* Plaintiff asserts that his treatment notes establish that he was agitated and under pressure, "perceived injustice directed towards him, becoming enraged and provoked," he became verbally abusive and had an explosive, judgmental temperament, did not respond well to pressure, and was constantly terminated from jobs because of his temper and anger issues. *See id.* (citing R. at 375, 381-82, 386). Further, Plaintiff contends that his treatment records from February 3, 2009 demonstrate that he was unable to motivate himself and that he became easily frustrated. *See id.* (citing R. at 379). For example, he claims that the record shows that he refused to complete paperwork, was unwilling to take medication, was "gruff with the staff," and tended to blame others and avoided acknowledgment of his need for anger management. *See id.* at 16-17 (citing R. at 386-87).

"To determine what weight to give a medical opinion, an ALJ must consider the following: (1) the examining relationship; (2) the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other considerations brought to the attention of the Commissioner." *Dwyer v. Astrue*, 800 F. Supp. 2d 542, 549 (S.D.N.Y. 2011) (citing 20 C.F.R. § 416.927(d)).

While an ALJ is required to, "regardless of its source, . . . evaluate every medical opinion . . . receive[d]," when a plaintiff's treating source's opinion regarding the nature and severity of a plaintiff's impairment(s) is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," the ALJ will give controlling weight to medical opinions offered by the plaintiff's

treating sources.[1]  20 C.F.R. § 404.1527.  If, however, the treating source's opinion is found to be inconsistent with the other substantial evidence in the case record, it will not be given controlling weight and is then reviewed by the ALJ, in light of the following factors: (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors.  *Schaal v. Apfel*, 134 F.3d 496, 503  04 (2d Cir. 1998); *see* 20 C.F.R. § 404.1527.  Upon issuing a notice of determination or a decision as to the weight accorded to the treating source's opinion, the ALJ must provide good reasons for doing so.  *Id.*  Though ultimately, the final determination of disability and a claimant's inability to work rests with the Commissioner.  *Snell v. Apfel*, 177 F.3d 128, 133  34 (2d Cir. 1999); *see also* 20 C.F.R. § 404.1527(e).

In the present matter, the ALJ correctly determined that Dr. Noia's opinion was entitled to great weight.  Aside from his own complaints, the record is devoid of evidence suggesting that Plaintiff has a severe mental impairment.  Colleen Miller, LCSW, who treated Plaintiff from 2007 through part of 2009, indicated that, as his therapy progress, Plaintiff reported increased control over his temper and "a significant reduction in incidents of poor anger management."  *See* R. at 369-77.  In August of 2008, Plaintiff reported that he had no recent incidents or outbursts of anger, and it was noted that Plaintiff made significant progress at increasing his frustration tolerance and reducing his overreactions when irritated.  *See id.* at 370.  These improvements were noted from December 2008 through August 2009.  *See id.* at 377, 385.  Further, although

---

[1] This is typically the case because treating sources "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individuals examinations, such as consultative examinations or brief hospitalization."  20 C.F.R. § 404.1527(c)(2).

Plaintiff complained to Dr. Guarascio that he was "depressed" and that he lacked motivation to engage in the activities he enjoys, Dr. Guarascio informed Plaintiff that "his stated symptoms do not meet diagnostic criteria for depression." *Id.* at 386-87. Moreover, despite his complaints, Plaintiff admitted to Dr. Guarascio that he still does engage in the activities he enjoys, *i.e.*, playing Dungeons and Dragons and spending time with friends. *See id.* Finally, in September 22, 2010, during a physical examination, Plaintiff denied any anxiety, depression or suicidal ideations. *See id.* at 451.

The record also demonstrates that, despite his complaints of depression and issues with anger management, Plaintiff repeatedly refused to take any prescription medications or attend group anger management sessions, as recommended by his treating therapists. *See id.* at 387, 439-41. As such, the Court finds that the ALJ did not err in giving great weight to Dr. Noia's opinion. Substantial evidence, including Plaintiff's statements and the medical records from Plaintiff's treating therapists, fully support Dr. Noia's conclusion that, although Plaintiff "[a]ppears to have some difficulty with stress, . . . evidence shows that [Plaintiff] does not have any psychiatric symptoms that significantly impact his function." *See id.* at 424. Further, the record is clear that the ALJ properly applied the factors contained in 20 C.F.R. §§ 404.1527 and 416.927 in determining the appropriate weight to give the opinions.

### 2. The ALJ properly considered Plaintiff's depression

Plaintiff contends that the ALJ's conclusion that Plaintiff has no more than a "mild limitation" to social functioning and to concentration, persistence and pace was not supported by substantial evidence. *See* Dkt. No. 17 at 17-18. Specifically, Plaintiff asserts that the ALJ misconstrued his testimony and the record evidence. *See id.*

14

When a claimant alleges that a mental impairment is "severe," "[t]he Regulations require the ALJ to utilize a 'special technique' at each step of the administrative review process.'" *Rosado v. Barnhart*, 290 F. Supp. 2d 431, 437 (S.D.N.Y. 2003) (citing 20 C.F.R. §§ 416.920(a), 404.1520a(a)). First, the ALJ must evaluate the claimant's symptoms, as well as other signs and laboratory findings, and determine whether the claimant has a "medically determinable mental impairment." 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1); *see also Dudelson v. Barnhart*, No. 03 Civ. 7734, 2005 WL 2249771, *10 (S.D.N.Y. May 10, 2005) (citation omitted). If a medically determinable impairment exists, the ALJ must "rate the degree of functional limitation resulting from the impairment[.]" 20 C.F.R. §§ 404.1520a(b)(2), 416.920a(b)(2). This process requires the ALJ to examine all relevant clinical and laboratory findings, as well as the effects of the symptoms on the claimant, the impact of medication and its side effects, and other evidence relevant to the impairment and its treatment. *See* 20 C.F.R. §§ 404.1520a(c)(1), 416.920a(c)(1). The ALJ must rate the degree of the claimant's functional limitation in four specific areas, referred to as "Paragraph B" criteria: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. *See* 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). The ALJ rates the first three areas on a five-point scale of "none," "mild," "moderate," "marked," and "extreme," and the fourth area on a four-point scale of "none," "one or two," "three," and "four or more." 20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4). The regulations also provide that a claimant's mental impairment will generally be considered non-severe if he is rated "non" or mild" in the first three functional areas, and "none" in the fourth area. *See* 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1).

In the present matter, the ALJ found that Plaintiff's social functioning was mildly impaired. *See* R. at 19. The record reveals that Plaintiff engaged in a variety of social activities,

and was no more than mildly limited in social functioning.  When he was examined by Dr. Noia, Plaintiff was cooperative, and his manner of relating, social skills, and overall presentation were adequate.  *See id.* at 409.  Plaintiff reported that he could take public transportation and that he got along well with his friends and family.  *See id.* at 410.  Plaintiff also reported that he "spends his days doing chores, socializing, watching television, and listening to the radio."  *Id.*  Further, Plaintiff reported to Dr. Ratnarajah that he "does not feel the need for any counseling."  *Id.* at 19, 453.  The ALJ also noted that Plaintiff got together to play board games with his friends and family on a weekly basis and that he takes his daughter to a friend's house for their children to play together.  *See id.* at 19, 43, 196-97, 386.

The ALJ's findings are also supported by several medical opinions.  Dr. Noia found that Plaintiff would be capable of making appropriate decision, and would be able to relate and interact moderately well with others.  *See* R. at 411.  Dr. Totin, the state agency reviewing psychologist, determined that Plaintiff had only mild difficulties in maintaining social functioning.  *See id.* at 422.  After reviewing Plaintiff's medical record, Dr. Totin opined that Plaintiff's depression was not severe.  *See id.* at 424.  Accordingly, the Court finds that the ALJ's finding at step two was supported by substantial evidence.

In support of his argument that the ALJ erred in finding that he had only a mild limitation in his concentration, persistence, and pace, Plaintiff cites to his own testimony in which he states that he had diminished concentration with increased pain.  *See* Dkt. No. 17 at 18.  The ALJ's finding, however, is supported by the opinions of Drs. Noia and Totin.  Dr. Noia assessed that Plaintiff's attention and concentration were intact, that he could do calculations, counting, and serial three tests.  *See* R. at 410.  Dr. Noia also found that Plaintiff's recent and remote memory skills were also intact.  *See id.*  Dr. Totin also found only a mild limitation in this domain.  *See id.*

at 422.  Finally, in the "Function Report" Plaintiff filled out in which he was asked to describe his

illnesses, injuries, or conditions that limit his activities, Plaintiff indicated that he does not "have

problems paying attention," and that he can finish what he starts,"follow spoken instructions," and

"follow written instructions."  *See* R. at 198.


### 3. The ALJ properly evaluated Plaintiff's credibility

Next, Plaintiff contends that the ALJ committed reversible error in failing to properly

utilize the factors of SSR 96-7p and 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) in evaluating

Plaintiff's credibility and the subjective symptoms that Plaintiff contended were disabling.  *See*

Dkt. No. 17 at 18-27.

An ALJ must evaluate the intensity and persistence of those symptoms and any functional

limitations attendant to them in order to determine how they affect a claimant's capacity for work.

*See* 20 C.F.R. § 416.929(c)(1).  Since symptoms such as pain sometimes suggest a greater

severity of impairment than can be shown by objective medical evidence alone, the ALJ must

carefully consider any other information submitted by the claimant for its consistency with any

and all relevant evidence.  *See* 20 C.F.R. § 416.929(c)(3).  A claimant's statement(s) about the

intensity and persistence of a particular symptom, such as pain, or about the limiting effects the

symptoms have on their ability to work will not be rejected solely because the available objective

medical evidence does not substantiate a claimant's statement(s).  *See* 20 C.F.R. § 416.929(c)(2).

"However, the ALJ is not obliged to accept without question the credibility of such subjective

evidence."  *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 270 (N.D.N.Y. 2009) (citing *Martone v.*

*Apfel,* 70 F. Supp. 2d 145, 151 (N.D.N.Y. 1999)) (internal citation omitted).  "When such

[statements are] consistent with and supported by objective clinical evidence demonstrating that

[the] claimant has a medical impairment which one could reasonably anticipate would produce such pain, it is entitled to considerable weight." *Crysler v. Astrue*, 563 F. Supp. 2d 418, 439-40 (N.D.N.Y. 2008) (citations omitted).

If this is found not to be the case, as was found here by the ALJ, the "ALJ will consider the following factors in assessing a claimant's credibility: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms." *Rockwood*, 614 F. Supp. at 271 (citing 20 C.F.R. §§ 416.929(c)(3)(i)-(vii). In doing so, the ALJ will "consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence." 20 C.F.R. § 416.929(c)(4). The claimant's symptoms will "be determined to diminish [their] capacity for basic work activities . . . to the extent that [the claimant's] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 416.929(c)(4).

"An ALJ rejecting subjective testimony 'must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence.'" *Abdulsalam v. Comm'r of Soc. Sec.*, No. 5:12-CV-1631, 2014 WL 420465 (N.D.N.Y. Feb. 4, 2014) (quoting *Melchior v. Apfel,* 15 F. Supp. 2d 215, 219 (N.D.N.Y. 1998)). Further, the Agency rules provide that

> [i]t is not sufficient for the adjudicator to make a single,
> conclusory statement that "the individual's allegations have been

considered" or that "the allegations are (or are not) credible."  It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.  The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that
weight.

SSR 96 7p, 1996 WL 374186, at *2.

In the present matter, in finding that Plaintiff could perform at the level of sedentary work, the ALJ evaluated Plaintiff's credibility, and found that while Plaintiff's medically determinable impairments could reasonably have been expected to cause his alleged symptoms, his statements concerning the intensity, persistence, and limiting effects of those symptoms were only partially credible.  *See* R. at 20-23.  First, as the Commissioner correctly contends, it is worth noting that the ALJ largely credited Plaintiff's subjective complaints with respect to his exertional limitations. Although Plaintiff protests that the ALJ erred in assessing the effects of his toe and back pain, the ALJ limited Plaintiff to sedentary work, thereby significantly crediting Plaintiff's subjective complaints.  *See* R. at 21-22.

In fact, several medical opinions found that Plaintiff was capable of greater than sedentary work.  For example, in 2007, Dr. Shayevitz limited Plaintiff only in his capacity for repetitive forward flexing and heavy lifting.  *See* R. at 282.  In February 2010, Dr. Ganesh assessed no limitation in Plaintiff's ability to sit, stand, or use his upper extremities.  *See id.* at 405.  Dr. Ganesh noted that, despite Plaintiff's claims of an inability to walk on his heels or toes, or to squat, Plaintiff was observed interacting with his daughter, and was able to bend and walk without difficulty.  *See id.*  Further, an x-ray of Plaintiff's lumbar spine was negative.  *See id.* at 406.  Additionally, in May of 2010, Dr. Pierz noted that, despite Plaintiff's complaints of

difficulty walking, and an inability to be on his feet for any length of time, Dr. Pierz's staff had observed Plaintiff walking without any problems. *See id.* at 442. Further, Dr. Selvarajah, who treated Plaintiff's wrist injury, noted that Plaintiff exaggerated his pain. *See id.* at 317.

Plaintiff also contends that the ALJ improperly relied on the fact that he takes care of his child in deciding that Plaintiff's subjective complaints were only partially credible. *See* Dkt. No. 17 at 23-24. Although Plaintiff attempts to downplay the amount of time and attention his child required, the record indicates that Plaintiff was actively involved with her upbringing. For example, in August of 2008, after Plaintiff won primary custody of his daughter, Plaintiff's therapist noted that his daughter was "very demanding and busy, thus giving him an opportunity to practice patience." *See* R. at 371. The therapist also noted that Plaintiff was happier, and was adjusting to the increased responsibility of childcare. *See id.* Another treatment note indicates that Plaintiff was picking his daughter up after school to take care of her, as he did not want to pay for daycare. *See id.* at 373. Additionally, Plaintiff testified that he prepared her food, made sure that she bathed, cleaned, did laundry, and did other various household activities. *See id.* at 59-61. As such, the Court finds that the ALJ properly considered Plaintiff's role in taking care of his child in assessing Plaintiff's credibility regarding his subjective complaints. *See Poupore v. Astrue*, 566 F.3d 303, 307 (2d Cir. 2009) (holding that evidence that the plaintiff could take care of a young child demonstrated that the plaintiff's subjective complaints were not fully credible).

To the extent that Plaintiff is claiming that the ALJ failed to sufficiently support his credibility determination, the Court disagrees. *See* Dkt. No. 17 at 25. Rather, the ALJ discussed at length his reasons for finding Plaintiff only partially credible. *See* R. at 22. The ALJ discussed in detail the medical record and Plaintiff's own statements, in which "the claimant has reported a

range of activities of daily living that do not support a finding that he has any disabling medical impairments." *Id.*

Plaintiff also contends that the ALJ improperly determined that "'there is no evidence in the record . . .'" to support Plaintiff's contention that he has a learning deficiency that would impact his employability. *See* Dkt. No. 17 at 26. Plaintiff contends that this finding is only supportable if the Court "sustains the determination that the plaintiff has <u>no</u> credibility." *Id.* (emphasis in original). Contrary to Plaintiff's contentions, the record fully supports this determination. Plaintiff repeatedly denied any barriers or impairments to his ability to learn. *See* R. at 319, 322, 337, 340, 343, 347, 350. Further, Plaintiff's treating physicians regularly noted Plaintiff's normal mental status. *See id.* at 319, 322, 337, 340, 343, 347, 350, 353. Plaintiff reported that he could follow spoken and written instructions, and he has never alleged that his alleged cognitive impairment ever interfered with his ability to perform any of his past relevant work. *See id.* at 199, 263. At his psychiatric evaluation in 2007, Plaintiff informed Dr. Barry that he graduated from high school, having taken regular classes. *See id.* at 183. Plaintiff did inform Dr. Barry that he was a slow learner and had "some resource help;" he did not, however, allege a cognitive impairment and none of his treating physicians ever noted one. *See id.* at 389, 393, 395, 397.

Based on the foregoing, the Court finds that the ALJ correctly determined that Plaintiff's subjective complaints were not supported by objective medical evidence. As such, the ALJ properly concluded that Plaintiff's allegations of disability were not entirely credible.

### *4. Plaintiff could perform work in the national economy*

In step four of the sequential analysis, the ALJ found that Plaintiff could not perform his past relevant work as a general laborer. *See* R. at 23. At step five, however, considering Plaintiff's age, education, work experience, and residual functional capacity, the ALJ found that there were jobs in the national economy which Plaintiff could perform. *See id.* at 23-24. Plaintiff contends that the ALJ's determination was not supported by substantial evidence. *See* Dkt. No. 17 at 27. Specifically, Plaintiff argues that the "record supports marked mental limitations to concentration, persistence, or pace, a very limited ability to understand, remember and carry out even simple instructions, or accept criticism and work cooperatively with coworkers, and to make reasonable work judgments." *Id.* Further, Plaintiff contends that, "[w]hile such may not be of such severity to meet a Listing, they are still disabling, under SSR 85-15, since even 'unskilled work' requires that the plaintiff is . . . able to understand, carry out and remember simple instructions, to respond appropriately to supervision, co-workers, and usual work situations and to deal with changes in a routine work setting <u>on a consistent basis</u>." *Id.* (citing SSR 96-8). Further, Plaintiff argues that the "substantial evidence only supports the conclusion that Plaintiff was limited to: sitting for no more than 30 min. at a time, standing no more than 10 min. and walking no more than 10 min. at a time; sitting, walking and standing, in combination, can be done for no more than one and one-half in total hours, before needing to rest in a recliner." *Id.* Additionally, Plaintiff asserts that he can only infrequently lift twenty-five pounds, infrequently bend at the waist, twist or turn, and that he cannot, even on an infrequent basis, crawl, kneel, stoop or balance. *See id.*

Contrary to Plaintiff's contentions, the ALJ's determination that Plaintiff has the residual functional capacity to perform the full range of sedentary work was supported by substantial evidence. As discussed above, the ALJ properly considered Plaintiff's mental and physical

limitations in reaching this conclusion. The ALJ considered Plaintiff's testimony, including his activities during a typical day. *See* R. at 20-21. These activities included "playing with his daughter ('when possible'), fixing easy/simple meals, doing the laundry, and cleaning the house." *Id.* at 20 (citing Exhibit 3E/2-3, 6-8). Plaintiff also testified that his typical day "consists of taking his daughter to and from school and going to doctor appoint[ments] (averaging about 100 miles of driving a week); generally, he is up and down all day between his recliner and truck." *Id.* at 21. Moreover, as discussed, the ALJ correctly found Plaintiff only minimally credible regarding the severity and intensity of his impairments considering his own testimony and the medical record. *See id.* at 22-23.

Based on the foregoing, the Court finds that the ALJ properly determined that Plaintiff has the residual functional capacity to perform the full range of sedentary work and that Plaintiff could perform other work in the national economy.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that the Commissioner's motion for judgment on the pleadings (Dkt. No. 18) is **GRANTED** and Plaintiff's motion for judgment on the pleadings (Dkt. No. 17) is **DENIED**; and the Court further

**ORDERS** that the Commissioner's decision denying DIB and SSI is **AFFIRMED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in the Commissioner's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: May 29, 2014
   Albany, New York

Mae A. D'Agostino
U.S. District Judge